UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ADOLFO DIAZ,

        Defendant,                      Case #:  16 Cr. 719 (RJS)

   v.

UNITED STATES OF AMERICA,

        Respondent.

_____/

### ADOLFO DIAZ'S MOTION FOR COMPASSIONATE RELEASE OR A SENTENCE REDUCTION PURUANT TO 18 U.S.C. 3582(c)

DEFENDANT ADOLFO DIAZ HEREBY Moves this Court pursuant to 18 U.S.C. Section 3582(c) for Compassionate Release or a Reduction in Sentence.  Based on his rehabilitation, his medical condition, and the harsh prison conditions related to the Coronavirus pandemic, Defendant Diaz believes his circumstances constitute extraordinary and compelling reasons to warrant either form of the aforementioned relief:

I.  Defendant Diaz Request & Exhaustion of His Administrative Remedy Process:

Before a Defendant, such as Defendant Diaz, may file a motion in the federal district court for consideration of Compassionate Release or Reduction in Sentence, he must make a request to the Warden to file a motion on his behalf.  According to case law, if the Warden denies the request, after the expiration of thirty days from the warden's denial, a defendant is deemed to have fully exhausted the administrative remedy procedure, and the district court has jurisdiction over a defendant's motion for consideration for compassionate release or reduction in sentence; Defendant Diaz exhausted his administrative remedy as he filed three requests for the warden to file a motion in the district court on his behalf seeking such relief.  In sum, those filings were submitted and decided as follows:

A.  Decision on September 28, 2021:

In early September of 2021, Defendant Diaz filed a request for the warden to file a motion in the district court seeking compassionate release or a reduction in sentence based on his medical condition and the coronavirus pandemic.  In a September 28, 2021 response the warden denied Defendant Diaz's request stating that he did not meet the criteria set forth in Program Statement 5050.50, and that his potential exposure to COVID-19 does not warrant an early release from his sentence.  (See Response of Warden, Exhibit 1).

B.  Warden Decision on December 20, 2021:

On December 16, 2021, Defendant Diaz filed another request upon the warden covering a wider range of reasons warranting his compassionate release or reduction in sentence.  For additional consideration he raised six reasons as to why the warden should file a motion in his behalf, arguing:

       (1)  his medical condition which effects his lungs;

       (2)  the current outbreak in the prison of COVID-19;

       (3)  the small portion left to serve on his sentence;

       (4)  the new variant of Omicron may be in the facility;

       (5)  vaccination cannot prevent a breakthrough infection; and

       (6)  his extensive programing which proves his rehabilitation

are all significant reasons to warrant that the warden file a motion in district court on his behalf for compassionate release or for a reduction in sentence.

On December 20, 2021, the warden denied Defendant Diaz's request, holding: "You were previously reviewed for Compassionate Release and appropriately denied on September 28, 2021."  (See Response of Warden, Exhibit 2).

C.  Warden's Decision on January 25, 2022:

In January of 2022, Defendant Diaz's request to the warden to file a compassionate release or reduction of sentence motion in the district court based on the fact that due to coronavirus pandemic the condition of his imprisonment has for over two years become more harsher and more severer than the sentencing court judge has envisioned. On January 25, 2022, the warden declined to file a motion in the district court on behalf of Defendant Diaz arguing that Defendant Diaz does not meet the policy criteria for such a motion and therefore he has no authority to file the motion. (See Response of Warden, Exhibit 3).  *  As a result, this motion for compassionate release or reduction of

_____

    *   Once the warden denies a request by an inmate to file a compassionate release or reduction in sentence motion in the appropriate district court, the prisoner is deemed to have exhausted his administrative remedy and the district court has jurisdiction to entertain the matter pursuant to Section 3582(c).

sentence has been filed by Defendant Diaz in a pro-se capacity. *

II. Defendant Diaz Meets the Extraordinary & Compelling Reason Standard
to Grant His Compassionate Release/Reduction of the Sentence Motion:

Defendant Diaz submits that for the below-noted reasons his motion for compassionate release or reduction of

sentence should be granted as his claims for such satisfy the extraordinary and compelling reason standard to warrant

relief.

A. Diaz's Rehabilitation & Clear Conduct:

Defendant Diaz has committed himself to take full advantage of the rehabilitation and educational programs avail-

able to him through the Bureau of Prisons ("BOP").

1. His Education:

For example, Defendant Diaz started his Pre-GED class on February 4, 2020, which concluded in late 2021 (see

Inmate Education Data Transcript, Exhibit 4). Thereafter, for the GED test, he was tested in four areas; that is,

reasoning through Language Arts; social Studies; Mathematical reasoning; and Science. His hard work for almost

two years had paid off as he passed each course and achieved his GED Certificate that was furnished to him him

on November 19, 2021. (See High School Equivalency Credential, Exhibit 5) also see (Verified Official GED Trans-

cript, Exhibit 6)(which details the eleven month period for the GED testing).

Although Defendant had some difficulty with reading comprehension he was afford extra time to pursued his short-

term goal to obtain his GED which was an important mile stone for the genesis of the transformation of his character.

At this point, Defendant Diaz would set his sights on a college education but the BOP no longer provides college courses

as the BOP did over a decade ago.

2. His Completion of over a Hundred Programs:

In over a two year period Defendant Diaz also enrolled in and successfully completed 102 programs offered by the

BOP. These programs basically fall into four categories, some of which intertwine with others, which are noted below

---

* Defendant Diaz moves this Court for assignment of counsel so he could be adequately represented in
this proceeding since some of the issues raised here deal with complex legalese and since Defendant Diaz is ig-
norant to the law controlling the issues raised herein. Therefore, appointment of an attorney would better serve
the defendant and the interest of judicial economy, too. (See 18 U.S.C. Section 3006).

and can be verified by the Inmate Education Data Transcript, Exhibit 4; below are some of these programs:

(a)  Employment Programs:

Job Ready Cert: Forklift Class
Barriers to Employment
Green Jobs
From Parole to Payroll
Keys to getting Hired
Job Survival
Get Hired
Soft Skills in the Work Place
Ex-Offenders Job Fair
Resumes
Career Exploration
Entrepreneur:  Own Boss
Digital Media Marketing
Start a Small Business
Common Job Interview Mistakes

(b)  Financial Programs:

FDIC Financial Recovery
Own Home
Loan
Charge it
Credit
Keep Safe
Pay Yourself
Checking
Money Matters
Borrowing
Bank on it
Foundation Finances
Older Pop

(c)  Health Programs:

Preventing Cardio Vascular Disease
Articular & Muscular System
Cell Structure & Metabolism
Human Body & Chem
Preventing Sex Transmitted Diseases
Management & Cardio Endurance

(d)  Psychology & Sociology Programs:

Life After Prison
Release & Integration
Starting Fresh
Out for Good
Brain Health
Talk with Your Doctor

As already indicated above some of these programs overlap one into another but every program is designed to be

a re-entry program for the equipment of the pupil to face life once he or she is discharged from prison.  Defendant

Diaz successfully completed all of the aforementioned programs because he was determined with strong resolve to make a change in his life that would change the whole course of his protectory after the completion of his term of imprisonment.   Between his Educational achievement and his extensive rehabilitation programing Defendant Diaz submits to this Court that he has rehabilitated himself and is ready for re-entry into society.

In United States v. Sardar, 2021 U.S. Dist. Lexis 111670, at *3 (E.D. Mich 2021), the district court held that Courts have interpreted extraordinary in the context of compassionate release as beyond what is usual, customary, regular, or common and a compelling reason as one so great that irreparable harm or injustice would result if the relief is not granted.  See United States v. Sapp, 2020 U.S. Dist. Lexis 16491, at *3 (E.D. Mich 2020) also see United States v Murphy, 2020 U.S. Dist. Lexis 85624 (E.D. Mich. 2020).

Everything Defendant Diaz accomplished in the past two years is above and beyond ordinary and usual and customary and should be noted that he did these amazing achievements during the coronavirus pandemic.  These are significant proof that Defendant Diaz is rehabilitated and now is an asset rather than a liability to any community he returns to upon his release.

3.   His enrollment and Completion of the Challenge Program:

And if all of these programs are not enough evidence of rehabilitation, Defendant Diaz went through an intensive and extensive 14-month in-resident Challenge Program offered by the BOP's psychology Department.  Psychologists facilitated group discussions and workshops.  Defendant Diaz attended 38 group sessions which amounted to over 500 hours of psychological group therapy.  Plus, Defendant Diaz completed work assignments relative to group discussions.  (See BOP Psychology Service, Group Participation, Exhibit 5).

The group discussions, among other things, dealt with:

Illogical Thinking

Criminal Thinking

Victim Impact

Critical Thinking

Drug Addiction

Anti-social Behavior & more

In United States v. Redd, 444 F.Supp 3d 717, 729 (E.D. Va 2020), the court found a sentencing reduction was proper where inmate "demonstrated a commitment to self-improvement, devoting hundreds of hours to vocational programs, assisting others in their rehabilitative efforts, exhibiting solid work habits, caring for mental health inmates, and in process exceeding his supervisor's expectations across most, if not all, areas of work.

Evidenced above is the hundreds of hours that Defendant Diaz has devoted to his rehabilitation which has dramatically transformed his character.   Equally noted above is his over 500 hours of psychological group programing in which he not only helped himself but others as well who participated in the Challenge Program.  As part of the group, every member is required to participate in every function and exercise and workshop and group members are paired together which means they assist each other in their improvement to better themselves in a myriad of areas.

4.  His Employment in the Prison:

Defendant Diaz has been steadily employed during his whole term of imprisonment.  At MDC in Brooklyn, New York between 2017 and 2019 Defendant Diaz was employed in the capacity of janitorial position and a barber.  At USP Allenwood he was employed in the Food Service in the sanitation department for approximately two years.  And currently he is employed in the Recreation Department as a gymnasium janitor.  He has had good work reviews by his supervisor and by his unit team during his case reviews.  This is another indicator demonstrating that Defendant Diaz has been rehabilitated by his dedication to his employment opportunities while in prison.

In fact, Defendant Diaz's work performance rating justified a bonus for his outstanding work.  The work performance is scored by a number of factors some being the quality of his work, quantity of his work, initiative and interest in his work, and his ability to learn and need for supervision and response to supervision.  In all these areas and more Defendant Diaz was deemed to have earned a bonus in his salary; these observations and findings speak volumes about how he will perform in the work industry upon his release.   (See Work Performance Rating - Inmate, for Diaz, Exhibit 6 & Exhibit 7 & Exhibit 8).

In fact, Defendant Diaz has guaranteed gainful employment upon his release with Donjito Restaurant at 122 Mamaroneck Avenue, Mamaroneck, New York 10543, in the capacity as a dish washer.  Contact numbers are as follows:  (914) 902-5486 & (914) 230-2031.  (See Donjito Restaurant Letter, dated July 7, 2021, Exhibit 9).

5.  His Disciplinary Record:

Another important factor which cannot be overlooked is that Defendant Diaz does not have a single disciplinary infraction since his incarceration.  (See Inmate Discipline Data, Chronological Disciplinary Record, Exhibit 10).  At the bottom of the blank page, it indicates that "Disciplinary Data Does Not Exist For This Inmate."  Courts have consistently held that a prisoner's clear conduct in prison sends a strong connotation that he or she will be a law abiding citizen once reentry is made.

Maintaining a clear disciplinary record is no minor feat in prison.  See United States v. Stephenson, 2020 WL 256-6760 at *7 (.S.D. Iowa May 21, 2020); see also  United States v. Ledezma-Rodriquez, 472 F.Supp 3d 498, WL 397157 at *6 (S.D. Iowa, 2020)(granting compassionate release and noting that the defendant has not incurred a single disciplinary infraction since 2014, no small feat in a closely monitored federal prison); see also United States v. Marks, 455 F.Supp 3d 17, 27, 36 (W.D.N.Y. 2020).

The Court should take this clean slate as powerful evidence supportive of rehabilitation.  Defendant Diaz went beyond his call of duty when it came to transformation of his character which was driven by his remorse over his past criminal history which brought him to prison.  His way of thinking and his way of reacting and his way of making decisions has taken a 180 degree turn in the opposite direction for what's morally right.  He can now re-enter society never to return to anti-social behavior but rather to be an asset to society.

A review of these five area shows that Defendant Diaz has put a lot of time and hard work into his rehabilitation. In conjunction with other areas, listed below, his rehabilitative affords should amount to extraordinary and compelling reasons to warrant compassionate release or a sentence reduction at minimum.

B.  Defendant Diaz's Health:

Defendant Diaz has experienced bouts with breathing problems for over 5 years.  During his incarceration at USP Allenwood, he has made known this problem to his primary healthcare providers.  For example, at four clinical appointments, healthcare providers recorded Diaz's breathing complaint as follows:

(a)  August 24, 2021 Appointment:

Clinician Tina Palmeter, C.M.A., noted  "Reasons for reporting to sick call: Inmate complains of 'there's times when my breathing goes bad and lose my strength to breathe.' has been going on for 5+ years since he was stabbed right

flank 2013 and had chest tube at that time. happens when working out and some times at night, not an everyday occurrence." Clinician Palmeter also suggested to Diaz and noted it in her clinical encounter that "over the counter medications are available from commissary." (See BOP. Health Service, Clinical Encounter, Exhibit 11). *

(b) August 31, 2021 appointment:

Clinician Tina Palmeter, C.M.A., recorded the following data during her clinical appointment with Diaz, writing: "Reasons for reporting to sick call: Inmate complains of shortness of breathe occasionally, last night he had an epi-sode that woke him from his sleep, he does not know how long it lasts ... over the counter medications are available from commissary." (See BOP, Health Services, Clinical Encounter, Exhibit 12). *

(c) September 13, 2021 Appointment:

Clinician Palmeter, C.M.A., docketed the following data during her clinical encounter with Diaz, writing:  "Reasons for reporting to sick call:  "He states he recently had COVID and has recovered from that but has had breathing prob-lems for 4-5 years." (See BOP, Health Services, Clinical Encounter, Exhibit 13).

2.  Diaz's Pre-Incarceration:

In July of 2013, Diaz was stabbed by a man during a physical altercation which sent him to the hospital requiring emergency surgery.  Diaz left lung was collapsed due to the stab-wound puncture.  While the emergency room staff prepped him for surgery, a doctor wrongly inserted the chest tube and in the process punctured the other lung and lacerated the liver and perforated the diaphragm.   These serious injuries practically cost Diaz his life and he re-mained in critical condition for a while.  Afterward Diaz experienced problems with his breathing occasionally.

It is well established that COVID-19 and its variants "attack the lungs and can cause a host of respiratory condit-ions: shortness of breath, and hypoxia (oxygen deficiency) as well as pneumonia, acute respiratory distress syn-drome, and permanent lung damage." See United States v. Mueller, 471 F.Supp 3d 625, 629 (E.D. Pa 2020).

Additionally, according to the CDC "individuals of any age who have serious underlying medical conditions, includ-ing serious lung conditions are at high risk of suffering severe health risks from CIVID-19" (See United States v. Moore

---

\*    It should be acknowledged that there are no over the counter medications sold at the commissary for treating shortness of breathe.  Clinician Palmeter, of course, inadvertently made this suggestion to Diaz.

2020 U.S. Dist. Lexis 205073 at *6 (E.D. Mich.); see also http://www.cdc.gov/coronavirus/2019-n.cov/need-precaut-

ions/people-at-high-risk html (Sept. 11, 2020).  While the lung injury, sustained by Diaz is not listed among the

CDC's high-risk categories, it is clear from a review of the listed conditions that lung issues put individuals at risk

for a more severe illness if they contract COVID-19.

   3.  Defendant Diaz's Societal Doctor's COVID Prognosis:

In his letter, dated June 4, 2021, Dr. Adnan Yunus, wrote:

> "Adolfo Diaz has numerous medical ailments.  Mr. Diaz suffered an almost
> fatal stab wound years ago, where he was rushed and admitted to St. Jo-
> seph's Hospital ... during his critical stay in the Intensive Care Unit, Dr.
> Garcia inserted a chest tube into Mr. Diaz's chest the wrong way, insert-
> ing it into the wrong rib cage puncturing both lungs ... he still suffers
> from side effects of the medical negligence received such as shortness
> of breath, trouble breathing, coughing, wheezing, occasional asthma,
> extreme fatigue, and low immunity.  Given the unfortunate circumstan-
> ces Mr. Diaz was dealt with, makes him very susceptible to catching the
> COVID-19 virus.  This virus targets and attacks the lungs specifically.  I
> feel it would be deadly for Mr. Diaz if he were to come in contact with the
> COVID-19 virus.  Even though vaccines are available, they do not guarantee
> Mr. Diaz full protection against COVID-19.  Please be advised, Mr. Diaz was also
> given copies of his medical records, if needed.
>
> "If you have any questions please call the office at 914-237-7031."

(See Dr. Adnan Yunus letter, dated June 4, 2021, Exhibit 14).   As confirmed by Dr. Yunus' letter, Defendant Diaz has

had breathing problems and other respiratory abnormalities subsequent to his stabbing injury that collapsed one

lung and by the medical negligence that lacerated the liver and perforated diaphragm .  (See Operative Report, dated

7/5/13, Exhibit 15).  It should be noted that the diaphragm is the breathing muscle that does 80% of the respirat-

ion.  Based on Dr. Yunus' medical opinion these injuries to Mr. Diaz's lungs put his at risk of severe illness or death.

With the injuries to both lungs and other organs as well, it has compounded the risk and danger of COVID-19 and its

variants for Defendant Diaz.

   4.  Defendant Diaz's Vaccination:

Defendant Diaz received both vaccination shots of Moderna so he is fully vaccinated.  (See BOP, Health Service,

Vaccination Verification, Exhibit 16 & Exhibit 17); notwithstanding this, he got COVID and recovered with aftereffects.

   However, being fully vaccinated does not guarantee that a person will not have a breakthrough infection of COVID

and its deadly variants.  Reinfection is highly probable and many courts have still granted relief to defendants that

have already received either one or both vaccines. See United States v. Hatcher, 2021 WL 1535310 at *3 (S.D.N.Y. April 19, 2021). Since the prison environment is relatively small, the odds of re-infection is increased immensely. In United States v. Skelos 2020 U.S. Dist. Lexis 64639 at *3 (S.D.N.Y. April 12, 2020), the court held that "Jails and prisons are powder kegs for infection." Therefore, the risk of reinfection is not merely theoretical. See United States v. Common, 2020 WL 3412233 at *4 (C.D. Ill June 22, 2020). The BOP has reported multiple deaths from apparent COVID-19 reinfection. See U.S. Department of Justice, Inmate Death 20210113_press release_jes.pdf (bop.gov)(reporting death toll of prisoners).

Courts have realized that uncertainty still surrounds the degree and duration of protection vaccines provide against the virus or it mutations. As a result, although courts have acknowledged that recovering from COVID-19 and being fully vaccinated decreases the likelihood of severe symptoms, recent data reveals that the threat of severe illness or death from COVID-19, while diminished, is nevertheless real. See United States v. Sweet, 2021 WL 1430836, at **2-3 (E.D. Mich April 15, 2021). In fact, the potential for reinfection is not yet fully understood by medical experts. (See CDC, Coronavirus Disease 2019 (COVID-19), Reinfection, hhtps://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html).

As a result, Defendant Diaz can absolutely assert that his life continues to be in a constant state of jeopardy since COVID and it variants can easily make their way into the prison environment where there is no ability for him to social distance himself from the infected. And by the time the prison administrators learn of such an infection, the infected person has already spread it to countless people within the overcrowded prison system at USP Allenwood.

This reality of reinfection amounts to extraordinary and compelling reasons to grant Defedant Diaz's motion for compassionate release or a reduction of sentence and when viewed in light of the other reasons it solidifies such a decision.

C.  Defendant Diaz's Harsh & Punitive Prison Conditions:

The Court should also recognize that these past two years of incaceration have been especially difficult and punitive for Defedant Diaz as fear of the pandemic has gripped inmates at USP Allenwood and thoroughout the prsions in the country.

The BOP has been operating on a modified schedule since the inception of the virus into the country. The modifi-

10

ed schedule has restricted movement and programing which makes the time spent in the housing unit more punitive in nature. Plus, Defendant Diaz and his co-cell resident are trapped in a small cell for months at a time breathing the same air. USP Allenwood was original designed to accommodate half of the prisoner population currently designated to its cells. The overcrowded conditions surely violate the Building and Fire Codes and compounded by the COVID restrictions on social distancing, this only adds to the dangerous and punitive conditions at the prison. The Court cannot ignore the numerous lockdowns at the prison which only increase the harsh conditions of confinement.

Despite the outbreaks of COVID at USP Allenwood, and Defendant Diaz's own efforts to do everything to protect himself, it is impossible to practice social distancing, control his exposure to other inmates, wear protective clothing, or follow other necessary practices for protecting himself.

Courts reviewing motions for sentence modifications have additionally considered the extent to which numerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences harsher and more punitive than would otherwise have been the case. See United States v. Rodriguez, 2020 U.S. Dist Lexis 181004, at *7 (S.D.N.Y. September 30, 2020); United States v. Ciprian, 2021 U.S. Dist. Lexis 18698, at *8 (S.D.N.Y. February 1, 2021)(A day spent in prison under extreme lockdowns and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison, while not intended as punishment, incarceration in such conditions is unavoidable, more punitive).

Defendant Diaz has experienced a very controlled environment with little to no movement over the past two years and this lack of movement has made his time as the equivalent of harsh and cruel punishment which constitutes extraordinary and compelling reasons which should warrant compassionate release or a reduction in sentence.

III. Conclusion:

WHEREFORE, Defendant Diaz moves this Court for compassionate release or a reduction in sentence based on the aforementioned grounds which corporately amount to extraordinary and compelling reasons to justify either form of relief. In addition, Defendant Diaz moves this Court for the appointment of counsel in order that he may be represented by a lawyer who is well-versed in the law as opposed to himself who is a novice in law.

March 17, 2022

Respectfully submitted,

*Adolfo Diaz*

Adolfo Diaz, Pro-se
Reg # 78156-054
USP Allenwood Box 3000
White Deer, Pa 17887

## CERTIFICATE OF SERVICE

I, Adolfo Diaz, HEREBY Declare under penalty of perjury that a copy of the enclosed motion for compassionate

relief was sent to AUSA Eli J. Mark at One St Andrew Plaza, New York New York 10007, on this ___17___ day of March,

2022.

Respectfully submitted,

Adolfo Diaz

Adolfo Diaz
Reg # 78156-054
USP Allenwood Box 3000
White Deer Pa 17887



CERTIFIED MAIL

7021 0350 0000 1920 5391

⟨⟩78156-054⟨⟩
Adolfo Diaz
U.S.P Allenwood
3000 P.O BOX
White DEER, PA 17887
United States

SDNY

MAR 18 2022

Mailed From US Penitentiary

Clerk of Court
US DC
Southern District of NY
40 Foley Square
New York, NY 10007

U.S. POSTAGE PAID
PCOM, LL ENV
17887E DEER, PA
MAR 22, 22
AMOUNT
$0.00
R2308/K138972-08

1000
10007

FOREVER USA
PURPLE HEART

RECEIVED
MAR 25 2022
PRO SE OFFICE